# EXHIBIT "B"

BY FAX

COPY

Alan Romero (SBN 249000)
Ted Wells (SBN 321696)
Angela Xie (SBN 333530)
Lucas E. Rowe (SBN 298697)
ROMERO LAW, APC
251 S. Lake Avenue, Suite 930
Pasadena, CA 91101-4873
Tel: 626.396.9900 / Fax: 626.396.9990
Email: ajr@romerolaw.com, esw@romerolaw.com,
ler@romerolaw.com, yx@romerolaw.com

Attorneys for Plaintiff
PAUL JOHNSON

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

JAN 20 2022

BY _____
ANTHONY MARTINEZ, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN BERNARDINO

PAUL JOHNSON, an individual;

           Plaintiff,

v.

COUNTY OF SAN BERNARDINO, a public entity; and DOES 1-99, inclusive;

           Defendants.

Case No.: CIV SB 2201233

UNLIMITED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1) DENIAL OF MEDICAL CARE (42 U.S.C § 1983 / 8TH AMENDMENT) (Individual defendants)
2) DENIAL OF MEDICAL CARE (42 U.S.C. § 1983 / 8TH AMENDMENT) (Public entity liability)

COUNTY OF SAN BERNARDINO
APR 2 2 2022
CLERK OF THE BOARD

    **COMES NOW** the Plaintiff Paul Johnson, ("Plaintiff"), who alleges the following facts in support of his Unlimited Complaint for Damages and hereby respectfully demands *a speedy jury trial* on all causes of action stated herein as against County of San Bernardino ("the County"), who along with DOES 1-99, inclusive, are referred to herein as the "Defendants".

### CASE SYNOPSIS

    1.    Plaintiff Paul Johnson was diagnosed with cancer months before being jailed for a minor probation violation. Before he was jailed, he received chemotherapy and treatment, including prescription drugs. As part of his chemotherapy, Johnson was given a wristband after each chemotherapy session that included information pertinent to his next treatment and which identified

1

UNLIMITED COMPLAINT FOR DAMAGES

Exhibit B - 001

1  him as a cancer patient.

2      2.    When Johnson was arrested for his minor probation violation, failing to check in with his probation officer (something he was too sick to do), he informed the arresting Deputy that he had cancer. Johnson showed the deputy his wristband and his prescription drugs.

    3.    When Johnson arrived at the jail, his prescription drugs were confiscated. His wristband was cut. Johnson's jail intake medical records The County knew about his cancer and refused to treat it.

    4.    As a result, Johnson is blind in his left eye. He has disfiguring tumors on his head. He suffered head injuries in jail as a complication of his cancer, which got infected because his cancer weakens his immune system. The infections caused severe pain. Johnson's blindness is permanent.

    5.    None of this would have happened to Johnson if the County had treated his cancer.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Jurisdiction and Venue

    6.    This Court has jurisdiction of the subject matter of Plaintiff's claims. Jurisdiction is proper in this Court because the damages and claims alleged and demanded herein by Plaintiff exceed $25,000, and Plaintiff herein does make a demand and prayer for damages in excess of the jurisdictional minimum of this Court.

    7.    This Court has personal jurisdiction over Defendant COUNTY OF SAN BERNARDINO, in that it was, at all times relevant to this action, a California charter county and a political subdivision of the State of California maintaining all of its places of business in the County of San Bernardino.

    8.    Venue in this Court is proper, in that on information and belief, Defendants reside in the County of San Bernardino.

    9.    All the harm suffered by Plaintiff took place within this judicial district.

### The Parties

    10.    Plaintiff PAUL JOHNSON was a convicted prisoner in custody at the West Valley Detention Center for a violation of his probation. He is currently out of jail. Mr. Johnson has

1 leukemia and lymphoma.

2   11.   Defendant County of San Bernardino, California is, and was at all times relevant to this lawsuit, a California charter county and a political subdivision of the State of California, duly organized and existing as provided by California law. The County of San Bernardino owns and operates the West Valley Detention Center, where Plaintiff was incarcerated.

### Factual Allegations

12.   Plaintiff Paul Johnson was incarcerated at the West Valley Detention Center, 9500 Etiwanda Ave, Rancho Cucamonga, CA 91739, from approximately May 15, 2021 to August 18, 2021. During that time, the County refused to treat Johnson's cancer. As a result, the cancer has spread throughout his body. He now has tumors on his head and is blind in one eye.

13.   Johnson was diagnosed with cancer on or about February 5, 2021. He was prescribed approximately eight different medications, IV chemotherapy, and weekly blood transfusions by the diagnosing doctor, who also oversaw Johnson's treatment. Johnson has leukemia and lymphoma. Johnson's cancer treatment began immediately upon diagnosis and continued uninterrupted for approximately three months, until the County knowingly and willfully refused to treat his cancer. Part of Johnson's treatment protocol is, during chemotherapy appointments, providing him with a wristband to wear until his next appointment. The wristband identifies Johnson as a cancer patient and contains information pertinent to his next chemotherapy treatment. The wristband is provided to Johnson by a medical care provider. The chemotherapy relies on the information set forth on Johnson's wristband at his next therapy session. Johnson would wear the wristband between appointments.

14.   Johnson was arrested on or about May 15, 2021 for a violation of his probation. Johnson failed to contact his probation officer. At the time, Johnson was bedridden from illness and did not have the strength to pick up the phone to make contact. Nevertheless, a warrant issued for his arrest for failure to contact his probation officer, and Johnson was arrested by a San Bernardino County Sheriff's Deputy.

15.   When Johnson was arrested, he was wearing his chemotherapy wristband, which identified him as a chemotherapy patient. Johnson also had a bag filled with his prescriptions. The

UNLIMITED COMPLAINT FOR DAMAGES

1  bag was from a local pharmacy and could have been readily identified as such. The bag contained
2  only Johnson's prescription medication, in the appropriate prescription bottles. At the time of his
3  arrest, Johnson told the arresting Deputy that he had cancer.

4      16.    Shortly after his arrest, the arresting Deputy took Johnson to Arrowhead Regional
5  Medical Center, where he was screened for COVID-19 before being taken to the West Valley
6  Detention Center. Johnson tested negative. At that time, Johnson told the nurse at Arrowhead and
7  the arresting Deputy that he had acute lymphoblastic leukemia. The nurse tested Johnson's blood
8  and informed him and the arresting Deputy that Johnson was on the verge of needing a blood
9  transfusion, in that Johnson's hemoglobin count was low. Johnson was then taken to jail at the West
10 Valley Detention Center.

11     17.    Johnson's intake screening at West Valley Detention Center was performed by a
12 Deputy Sheriff, not any medical personnel. Johnson told the intake Deputy that he had leukemia.
13 Johnson was wearing his chemotherapy wristband at the time. Johnson was carrying his prescription
14 medication when he entered the jail, which was in prescription bottles conspicuously labeled as
15 such, with Johnson's name on the bottle, and which were in a bag from a local pharmacy that was
16 readily identifiable as being from a local pharmacy. The jail confiscated these medications. As
17 Johnson would learn when he was released from jail, jailers put his prescription medication with the
18 rest of his belongings and stored them along with his clothes and other personal affects. After jailers
19 confiscated Johnson's prescription medication necessary to treat his cancer, and despite his recent
20 negative test for COVID-19, Johnson was placed in COVID quarantine for a period of two weeks.

21     18.    At an early point during Johnson's incarceration, a one of Johnson's family members
22 drove to the West Valley Detention Center with medical documents relating to Johnson's cancer
23 diagnosis and medical treatment, and provided the same to unknown persons at the jail. These
24 documents and the information within them did not move anyone at the jail to treat Johnson for his
25 cancer.

26     19.    West Valley Detention Center's COVID quarantine protocol at the time of Johnson's
27 incarceration there was solitary confinement, allowing Johnson out of his one-man cell for periods
28 of 30 minutes at a time. While Johnson was in quarantine, he could not use the telephone, nor could

1  he request medical attention through one of the electronic kiosks by which inmates at West Valley
2  Detention Center can use to file grievances, request medical care, or address other matters. However,
3  Johnson was attended to by a jailer on approximately an hourly basis when he was in COVID
4  quarantine. Johnson mentioned his cancer and his medications to the attending jailer at least once
5  per day during this two-week period. Johnson mentioned his cancer and medications to new jailers
6  at shift changes. From time to time, a jailer would promise to look into it, but no one ever did.
7  Johnson went without any meaningful medical treatment during this time. Johnson wore his
8  chemotherapy wristband during this period.

9       20.    After completing COVID quarantine, Johnson was assigned to the jail's general
10 population. Johnson was housed not in medical housing, but instead, in a 60-man dormitory with
11 bunk beds stacked two high in a big open room. The dormitory had a kiosk in it, at which Johnson
12 could request medical attention. He did so on the first day of his assignment to the dormitory.
13 Approximately <u>4 days later,</u> Johnson was sent to the jail clinic. There, he told the nurse about his
14 leukemia, and his treatment for it, including his chemotherapy and prescription drugs. A jailer was
15 present during the medical consultation per County policy. Johnson was wearing his chemotherapy
16 wristband during this meeting. The jailer cut Johnson's chemotherapy wristband off at that time.
17 The nurse tested Johnson's blood and received a reading of low hemoglobin. The nurse said, "that
18 can't be right," tested Johnson's blood again and satisfied herself that Johnson could be sent back
19 to the dormitory. The nurse then sent Johnson back to the dormitory. The nurse did not administer
20 any of Johnson's prescription medications. The nurse did not make any plan of care for Johnson.
21 The nurse did not order that Johnson be housed in medical housing. The nurse did not make any
22 arrangements for Johnson to receive chemotherapy.

23      21.    Johnson soon became extremely ill. He grew weak and knew that he needed a blood
24 transfusion. He became clumsy and would hit his head on the bunk beds. He requested treatment
25 for weeks at the kiosk.

26      22.    Approximately <u>two months</u> after he was jailed, Johnson was sent to the jail infirmary,
27 where he was placed in medical housing. He was not given his prescription medication and he was
28 not given chemotherapy. After midnight one night while Johnson was at the infirmary, a nurse pulled

1 him out of bed for an evaluation. She determined that he needed to go to the emergency room.
2 Johnson was taken to Arrowhead Regional Medical Center.

3      23.   Johnson was at Arrowhead Regional Medical Center for approximately 6 hours. He
4 was given a CAT scan. The doctor there told Johnson that he had hematomas and internal injuries.
5 No tumors were detected on Johnson's head, and Johnson had stereo vision at the time. Johnson told
6 the doctor that he had leukemia and that West Valley Detention Center was not treating him for it.
7 Johnson was ignored, and taken back to jail.

8      24.   When Johnson was taken back to jail, jailers tried to put him on suicide watch. He
9 was not suicidal and said so. The mental health nurse was busy, so jailers sent Johnson back to his
10 cell.

11     25.   On or about August 11, 2021, Johnson's medical condition had deteriorated to the
12 point that he was taken to the jail ward of Arrowhead Regional Medical Center. He was kept
13 shackled to a bed for a week. He was given IV antibiotics because his head wounds had become
14 infected, because his immune system was nearly nonexistent because of his cancer. Johnson was in
15 severe pain, and would scream in pain while lying shackled to his bed. The nurse refused to treat
16 Johnson's pain, falsely telling him that there was nothing that could be done about it. In truth, the
17 nurse willfully refused to administer medically necessary painkillers. Medical staff did not treat
18 Johnson's cancer at all.

19     26.   On or about August 18, 2021, Johnson was released from jail, while still in the jail
20 ward at Arrowhead Regional Medical Center. Johnson left of his own accord and returned to Loma
21 Linda University Medical Center, where he received treatment for his cancer prior to being denied
22 it by the County.

23     27.   The County completely refused to treat Johnson's cancer while he was in its custody,
24 despite being on actual notice of Johnson's cancer. The only medication Johnson was given for it
25 was Tylenol, even though Johnson brought a bag of his prescription medications to the jail with
26 him. Johnson's prescription medications were provided to him when he was released from jail, along
27 with the rest of his personal effects on him when he entered the West Valley Detention Center.

28

28. As a result of the County's refusal to treat his cancer, Johnson has developed disfiguring tumors on his head, and has lost stereo vision. The cancer spread to his optic nerve, damaged it, and caused Johnson to lose sight in his left eye. Johnson is blind in his left eye because the County refused to treat his cancer, when it knew that he had cancer. This condition is permanent.

29. Defendant County of San Bernardino subjects all people confined in its jails, including Johnson, to a substantial risk of injury and death by failing to provide adequate medical care. People in the County of San Bernardino's jail are entirely dependent on the County for their basic health care needs. But the County has a policy and practice of inadequately screening for serious health care conditions and disabilities, delaying access to clinicians and medications, understaffing health care professionals, delaying access to specialty care such as the oncology treatment that the County wrongfully denied Plaintiff Johnson, and failing to provide the full array of services necessary to meet minimum standards of care. The County of San Bernardino is deliberately indifferent to the risk of harm caused by these serious failures to adequately provide health care.

30. The County has a policy and practice of failing to adequately complete the most important encounter in a medical care delivery system—the intake screening. An adequate intake screening is necessary because it identifies medications, infectious diseases, and health conditions that must be addressed to prevent injury and death. The County assigns jailers to conduct the majority of the intake screenings. These jailers are not qualified to recognize and respond to the signs and symptoms of serious medical conditions such as cancer, substance withdrawal, or infections disease. They are not qualified to identify, nor does the County, verify, prescribed medications for people entering the jail, especially for those who are in extreme distress, have cancer, or are under the influence of drugs.

31. Mr. Johnson's intake is no exception. His intake documents check the "yes" box for "any injuries or illnesses?" and check the "yes" box for "any required medication"? Yet he was assigned to the general population, not medical housing, nor the jail ward of Arrowhead Regional Medical Center, and he was not referred for further medical screening by jail medical staff. The County had actual knowledge of Johnson's cancer and need for medication, yet it refused to provide

him treatment for his cancer and it refused to provide him his necessary medication. With actual knowledge of Johnson's cancer and need for medication, the County refused to house him

32. The County does not consistently respond in a timely manner, if it responds at all, to people who submit requests for medical treatment regarding serious medical conditions. For example, Johnson requested medical treatment for his cancer. The County refused to provide it. It took the County <u>4 days</u> to respond to Johnson's request for treatment via kiosk, which was not his first request. Johnson requested medical treatment for weeks for his head injuries before being treated for them. Relatedly, former inmate Zachery Shovey (who is no longer in County custody) reported seizures on <u>February 22, 2015</u> and <u>March 1, 2015</u>, and indicated that his seizure medications may need to be adjusted. Medical staff did not respond to either report. Mr. Shovey was not evaluated by medical staff until a jailer made an emergency call on <u>April 3, 2015</u> to report that Mr. Shovey was having another seizure. Johnson's ordeal was substantially identical, and compounding the failure, it was approximately 5 years later. Many of these types of emergencies, including those that require hospitalizations, could be avoided if the County had a policy and practice of timely responding to requests for medical treatment.

33. The County does not have a functioning system to ensure that people receive timely access to specialty care and that specialists' treatment recommendations are provided. Jail medical care providers fail to monitor inmates' specialty services once they have been referred, and thus do nothing when a specialty appointment is missed or when a specialist recommends treatment that must be ordered by a jail provider. Similarly, the County does not have an effective system to timely receive diagnostic test results that are necessary for adequate treatment of serious medical conditions.

34. The County has a policy and practice of failing to adequately review, document, or correct any deficiencies in care. For people who die in custody, the County's practice is to gather records at least 8-12 months regarding the death and confer with its attorneys. There are no documented findings or conclusions from the records. For people who do not die in custody, there is no assessment or evaluation of the overall quality of care, identification of problems or shortcomings in the delivery of care, corrective action to overcome these deficiencies, or follow-up

monitoring to ensure corrective steps are effective. The County's failure to implement an effective quality assurance program results in a substantial risk of harm of preventable injury and death, such as the entirely preventable complications of Johnson's cancer that resulted in disfiguring tumors, head injuries, and blindness.

## FIRST CAUSE OF ACTION
## DENIAL OF MEDICAL CARE
## 42 U.S.C. § 1983 / 8th Amend. U.S. Const.
## (Against Defendants DOES 1-99)

35. Plaintiff realleges, and incorporates herein by their reference, each and every allegation contained in the foregoing paragraphs, inclusive, as though fully set forth herein.

36. Plaintiff suffered from cancer. Plaintiff's cancer needed to be treated in order to prevent further significant injury and wanton infliction of pain, including but not limited to disfiguring tumors on the head, blindness in the left eye, bruises, and painful infections caused by Plaintiff's weak immune system, a complication of his cancer. Plaintiff's cancer constituted a serious medical need.

37. DOES 1-99, and each of them, had actual knowledge of Plaintiff's cancer and need for medication for his cancer. One such DOE defendant saw Plaintiff's chemotherapy wristband and cut it. Other DOE defendants were informed that Plaintiff had cancer; some of these told Plaintiff that they would look into it but did not, while others did nothing. Other DOE defendants were jail medical staff who had actual knowledge of Plaintiff's cancer and did not treat it. Still other DOE defendants were jail intake screeners who knew of Plaintiff's cancer and did not refer him for medical screening. Other DOE defendants received Plaintiff's medical documents setting forth Plaintiff's diagnosis of cancer, read them, and did nothing.

38. DOES 1-99, and each of them, were deliberately indifferent to Plaintiff's serious medical need, specifically, his cancer.

39. DOES 1-99 acted under color of California law at all times relevant to this action.

40. The acts and omissions of DOES 1-99, and each of them, each of them having actual knowledge of Plaintiff's cancer, caused Plaintiff's injuries.

41. As the result of the acts and omissions of DOES 1-99, who were deliberately indifference to Plaintiff's cancer, Plaintiff was harmed. He has disfiguring tumors on his head. He is blind in his left eye. He suffered bruises and pain. He can no longer work in construction, his trade, because he lacks stereo vision and cannot safely judge depth.

42. DOES 1-99 acted with malice and oppression, as those terms apply to Civ. Code § 3294, meriting an award of punitive damages.

## SECOND CAUSE OF ACTION
## DENIAL OF MEDICAL CARE
## 42 U.S.C. § 1983 / 8th Amend. U.S. Const.
## (Against Defendant County)

43. Plaintiff realleges, and incorporates herein by their reference, each and every allegation contained in the foregoing paragraphs, inclusive, as though fully set forth herein.

44. Plaintiff suffered from cancer. Plaintiff's cancer needed to be treated in order to prevent further significant injury and wanton infliction of pain, including but not limited to disfiguring tumors on the head, blindness in the left eye, bruises, and painful infections caused by Plaintiff's weak immune system, a complication of his cancer. Plaintiff's cancer constituted a serious medical need.

45. Plaintiff repeatedly informed multiple jailers and jail medical service providers that he had cancer. At times when Plaintiff so informed the jailers and jail medical service providers, Plaintiff had his prescription medications for cancer and/or a wristband on that identified him as a cancer patient. At one point, a jailer cut this wristband off Plaintiff's body. Defendant County knew of and disregarded Plaintiff's cancer.

46. The County was deliberately indifferent to Plaintiff's serious medical need, specifically, his cancer.

47. As set forth above, the County's official policies are the moving force of Plaintiff's injuries.

48. Additionally, as is evident from the foregoing, the County has not trained its jailers and its medical staff about appropriately treating inmates who have serious health issues, such as

cancer, like Plaintiff. The County knows that it jails people with serious medical conditions, but does not provide adequate training with respect to adequate medical care for such people to its officers and employees who come into contact with them.

49. Additionally, the County has an official policy, practice, or custom with the force of law, to not adequately screen or provide healthcare to inmates at the West Valley Detention Center.

50. Additionally, in the alternative, and on information and belief, Plaintiff's cancer and denial of treatment was brought to the attention of the appropriate final policymaker for the County of San Bernardino with respect to the provisioning of medical care to inmates, who approved such denial.

51. As a result of the County's deliberate indifference to Plaintiff's cancer, Plaintiff was harmed. He has disfiguring tumors on his head. He is blind in his left eye. He suffered bruises and pain. He can no longer work in construction, his trade, because he lacks stereo vision and cannot safely judge depth.

52. Plaintiff expressly DOES NOT seek punitive damages against the County of San Bernardino.

//
//
//
//

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as against Defendants, jointly and severally, as follows, for:

1) Compensatory damages in an amount according to proof at time of trial.

2) Attorney's fees and costs pursuant to all applicable statutes or legal principles, including, but not limited to: 42 U.S.C. § 1988.

3) Punitive, or exemplary damages pursuant to Civ. Code § 3294 as against the individual defendants only. Plaintiff does not seek punitive damages against the County, following *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

4) Costs of suit incurred.

5) Civil penalties as permitted by statute.

6) Prejudgment interest on all amounts claimed as permitted by law.

7) Post judgment interest on all amounts as permitted by law.

8) All other general, specific, direct, indirect, consequential, and incidental damages, in an amount according to proof at time of trial.

9) Such other and further relief as the Court may deem proper.

ROMERO LAW, APC

DATED: January 19, 2022          By: /s/ *[signature]*

Alan Romero (SBN 249000)
Ted Wells (SBN 321696)
Angela Xie (SBN 333530)
Lucas E. Rowe (SBN 298697)
Attorneys for Plaintiff
PAUL JOHNSON

//
//

## DEMAND FOR JURY TRIAL

Plaintiff hereby makes demand for Jury Trial, and has timely posted the jury fee deposit.

ROMERO LAW, APC

DATED: January 19, 2022      By: *(signature)*

Alan Romero (SBN 249000)
Ted Wells (SBN 321696)
Angela Xie (SBN 333530)
Lucas E. Rowe (SBN 298697)
Attorneys for Plaintiff
PAUL JOHNSON